IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 12, 2005

## STATE OF TENNESSEE v. NATHANIEL CHAMPION

**Direct Appeal from the Circuit Court for Coffee County**
**No. 32,205   Charles Lee, Judge**

––––––––––––––––

**No. M2004-02143-CCA-R3-CD - Filed May 11, 2005**

––––––––––––––––

A Coffee County jury convicted the Defendant, Nathaniel Champion, of the sale of a controlled substance, cocaine, and the trial court sentenced the Defendant to three years.  On appeal, the Defendant contends that: (1) the evidence is insufficient to sustain his conviction for the sale of cocaine; and (2) the trial court erred when it denied the Defendant's motion for dismissal of appointed counsel.  Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Margaret C. Lamb, Tullahoma, Tennessee (at trial and on appeal) and Laura D. Riddle and B. Campbell Smoot, Tullahoma, Tennessee (on appeal) for the appellant, Nathaniel Champion.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; C. Michael Layne, District Attorney General; Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Facts

A jury convicted the Defendant of the sale of a controlled substance, cocaine, and the trial court sentenced the Defendant to three years in prison.  The following evidence was presented at the Defendant's trial: Virginia Elrod testified that Detective Brent Perry asked her to contact the Defendant to buy cocaine from him, so she called the Defendant on a pay phone, and the Defendant agreed to meet her.  Elrod testified that the Defendant arrived in a blue car about twenty minutes after she called him, and she asked him for sixty dollars worth of crack cocaine.  Elrod testified that Detective Perry gave her sixty dollars.  She said that the Defendant went into a gas station, came back out, gave her the cocaine, and she gave him the sixty dollars.  She said that the cocaine was not wrapped in anything, and she gave the cocaine to Detective Perry.  She said that there were

detectives across the street who watched the entire transaction.

On cross-examination, Elrod testified that this was the first time that she had been contacted by the Tullahoma Police Department. She said that she had previously met the Defendant about three or four times. She testified that she called the Defendant at his home, and she had obtained his number through a friend. Elrod said that the Defendant answered the phone call, she spoke with him for about five minutes, and she told the Defendant that she "wanted some rock." She said that, at that time, she did not tell the Defendant how much cocaine she wanted. She testified that, when she met the Defendant, she was wearing a recording device provided by the police. Elrod said that the police gave her sixty dollars to purchase drugs, and she was not given any other money. She said that the police did not ask her if she had any other money, and she was not searched by the police for other drugs.

Elrod testified that the Defendant arrived at the gas station about twenty minutes after she had called him, and she had not known what kind of car he would be driving. She testified that she was aware that the police officers would be watching any transaction that occurred. Elrod said that, about fifteen minutes after the transaction at the gas station, she met with police officers behind the gas station. She said that the police took her to the police station, and she gave them the cocaine. Elrod testified that she has participated in a total of two drug transactions for the Tullahoma Police Department, but this transaction was her first, and the second drug transaction did not involve the Defendant. She said that, after these events, she has seen the Defendant on a couple of occasions.

Detective Jason Ferrell testified that, on March 15, 2002, he and Detective Perry met and had a conversation with a confidential informant, Elrod. He said that, based on that conversation, Elrod was given sixty dollars, and they placed a recording device on her. He testified that, as she left the office, he checked her to ensure that she had no narcotics on her, and, specifically, he said that he "patted her pockets," and Detective Perry asked her to empty her pockets. Detective Ferrell testified that he and Detective Perry dropped her off at the gas station. He said that he went to a building across the street, and he videotaped the transaction, and Detective Perry was responsible for the audio of the recording device. He testified that he knew that Elrod was going to call the Defendant, and she ordered sixty dollars worth of crack cocaine. Detective Ferrell testified that he heard Elrod make the phone call, but he did not hear her specifically say the Defendant's name because he was responsible for the videotape.

Detective Ferrell testified that, about twenty minutes after Elrod called the Defendant, he observed a blue four-door vehicle, which the Defendant was driving, arrive at the gas station. He said that he watched Elrod approach the Defendant's vehicle, have a conversation, and then the Defendant's vehicle pulled up to the front doors of the gas station. Detective Ferrell said that the Defendant entered the store and came back out a few minutes later with a bag. He said that the Defendant then drove through the parking lot, and stopped briefly at the phone booth where Elrod was located before leaving the parking lot. Detective Ferrell said, once the Defendant was out of the area, Elrod walked towards the building, and he and Detective Perry picked her up. He said that Elrod gave him cream-colored rocks that he suspected were crack cocaine, and he placed the rocks

in an evidence bag.

On cross-examination, Detective Ferrell testified that he has known the Defendant for seven years. He said that he has known Elrod for about one year, and she has not conducted any other drug transactions in which he was involved. He said that Elrod approached the police and told them that she would attempt to purchase narcotics from two individuals, one of whom was the Defendant. Detective Ferrell said that he did not provide Elrod with the Defendant's phone number, he did not know what phone number she was calling, and he did not attempt to determine in whose name the phone number was registered. He testified that, during this transaction, he could hear what was being said in the background, but he was not paying close attention because he was operating the video recorder. He said that he did not turn the video recorder off at any time during this transaction, and there was no splicing of the videotape. He said that the videotape focused on other vehicles, at some points, because he was not sure in what vehicle the Defendant would arrive at the gas station. Detective Ferrell said that he did not run the license plate number on the Defendant's vehicle, and, therefore, he did not know to whom the car was actually registered. He testified that he did not see anyone else in the Defendant's vehicle. He said that, based on the videotape, he did not see the transaction itself occur, and he could not see anything "pass hands." Detective Ferrell testified that, after he finished recording, he and Detective Perry picked up Elrod, she gave him the cocaine, and he put the cocaine in the evidence bag. He said that he did not check Elrod for other drugs after she gave him the cocaine. He testified that he did not know when the Defendant was arrested for this incident, but he knew that it was not within forty-eight hours after the transaction.

Brent Perry, a detective with the Tullahoma Police Department, testified that, on March 15, 2002, he was involved in a narcotics operation. He said that he was contacted by Elrod and decided to use her as an informant. He explained that Detective Ferrell had a previous discussion with Elrod, and she told him that there were two individuals that she could purchase narcotics from, one of whom was the Defendant. Detective Perry testified that, on March 15, 2002, he met with Elrod at the police station and gave her sixty dollars. He said that he asked Elrod to empty her pockets, and Detective Ferrell conducted a patdown search of her to insure that she had no narcotics on her. He testified that he and Detective Ferrell drove Elrod to the gas station, dropped her off, and proceeded to set up surveillance across the road.

Detective Perry testified that, to his recollection, Elrod had conversations with some other people while she was at the gas station, but she did not have close contact with anyone but the Defendant. He said that Elrod had the Defendant's phone number, and she called the Defendant's residence. He testified that, approximately thirty minutes later, a blue Oldsmobile four-door vehicle arrived, and Elrod approached the driver's side window, where she had a conversation with the Defendant. He said that the vehicle then pulled to the front of the gas station, and the Defendant exited the vehicle and entered the gas station. Detective Perry testified that the Defendant was in the store for a short time, returned to his vehicle, drove around the parking lot, stopped, and then had a short conversation with Elrod. He said that the Defendant then exited the parking lot and drove away toward his residence.

Detective Perry testified that, based on the audio recording of the transaction, he did not hear Elrod have a conversation with anyone else about selling drugs. He testified that Elrod brought back several small cream-colored rocks to the police. He said that, when he and Detective Ferrell picked up Elrod from the parking lot, she handed the rocks to Detective Ferrell, who placed the items in an evidence bag. Detective Perry said that, when they returned to the police station, he sealed and initialed the evidence bag. He said that he mailed the narcotics to the Tennessee Bureau of Investigation ("TBI") Crime Lab. He testified that the TBI sent the evidence back to him, and he put the evidence into locked storage, so that the evidence could be held safely until trial. Detective Perry testified that, through a court order, the Defendant requested that the narcotics be sent to an independent laboratory for analysis. He said that he sent the narcotics, in the evidence bag, to an independent laboratory and that the evidence was in a rock form, even after the TBI completed their analysis. Detective Perry said that he did not receive anything back from that laboratory.

On cross-examination, Detective Perry testified that either he or Detective Ferrell put the body wire on Elrod. He said that he and Detective Ferrell drove Elrod to the gas station, dropped her off, and parked directly across the street. He testified that he took the equipment from the vehicle and went to the third floor of the building across the street. Detective Perry testified that he had visual contact with Elrod during most of the transaction. He said that he did not have anything that enhanced his vision, such as binoculars. Detective Perry testified that he could not specifically state the exact moment that the transaction occurred, but a transaction did take place. He testified that the building where he recorded the transaction is about thirty-five yards from the front of the gas station. Detective Perry said that there were two transactions that were supposed to occur that evening, but the phone call that Elrod made was to the Defendant, not the second person. He said that, on the audio tape, he could hear the male voice, but he did not know exactly what was said.

Detective Perry testified that the Defendant approached Elrod two times during the operation. He said that, after the exchange, the tape was stopped, and he began to pack up the equipment. He testified that he proceeded to drive to the gas station, and Elrod handed the cocaine to Detective Ferrell, who placed it in a bag and carried it to the police station. Detective Perry said that Elrod was not searched right after she handed the police the cocaine, but was searched before the next purchase, which was unrelated to the Defendant and occurred about an hour later. He testified that he did not take the bag that contained the cocaine to the TBI laboratory, and he did not remember if he picked up the evidence from the laboratory. He said that he packed the evidence bag and sent the narcotics to the independent laboratory. Detective Perry testified that the drugs came back to him, but he agreed that there was nothing on the package that directed it to the Tullahoma Police Department, and he did not speak with anyone from the independent laboratory. Detective Perry testified that the evidence was previously in rock-like form, but is not in that form anymore. He said that, unless something was done to the narcotics at the independent laboratory, it was the same cocaine that was purchased on March 15, 2002.

Adam Gray, a special agent and forensic chemist with the TBI, testified that he received an evidence bag with the Defendant's name written on it on April 5, 2002, and he tested the contents of the bag on April 22. He said that the evidence bag was taped and sealed and contained "a loose

rock-like substance." He testified that he performed a presumptive and confirmatory test on the contents of the bag, and he determined that it was 0.2 grams of cocaine.

On cross-examination, Agent Gray testified that he first performed the presumptive test, which employs an ultraviolet light device. He said that he did not know if there was one rock or several rocks because the substance can break apart during handling. He testified that the confirmatory test is specific to cocaine. He testified that he weighed all of the rock-like substance in the evidence bag, not the bag itself, to determine how much cocaine was there, and he said that he cannot test the entire sample because he leaves a portion of the substance in case any retesting is needed. He said that, after the tests were performed, he put the evidence into a vault and prepared the results.

Based upon this evidence, the jury convicted the Defendant of the sale of a controlled substance, cocaine.

## II. Analysis

On appeal, the Defendant contends that: (1) the evidence was insufficient to sustain his conviction for sale of cocaine; and (2) that the trial court erred when it denied the Defendant's motion for dismissal of appointed counsel.

### A. Sufficiency of the Evidence

On appeal, the Defendant contends that the evidence is insufficient to support his conviction for sale of cocaine. Specifically, he asserts that there was insufficient evidence to prove that he was involved in the sale of cocaine because the informant, Elrod, had conversations with other people during the transaction time period, and the police did not visually observe him conducting a drug transaction. The State counters that the evidence was sufficient to support the verdict.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Carter, 121 S.W.3d 579, 588 (Tenn. 2003); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court may not substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions

concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.; see State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction may be based entirely on circumstantial evidence where the facts are "'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.'" State v. Reid, 91 S.W.3d 247, 277 (quoting State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993)). The jury decides the weight to be given to circumstantial evidence and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, 457 (1958) (citations omitted). While single facts, considered alone, may count for little weight, when all of the facts and circumstances are taken together, they can point the finger of guilt at the Defendant beyond a reasonable doubt. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Further, "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions . . . for the jury." Marable, 203 Tenn. 440, 313 S.W.2d at 457; see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

The jury found the Defendant guilty of the sale of a controlled substance pursuant to Tennessee Code Annotated section 39-17-417. That section states that an individual is guilty of this crime when he knowingly sells a controlled substance. We conclude that the evidence as presented through the testimony of the State's witnesses and the videotape of the drug sale is more than adequate to support the defendant's conviction. The informant, Elrod, testified that she called the Defendant, and she asked him to meet her at the gas station. Elrod said that the Defendant arrived, gave her the cocaine in exchange for the money. Detectives Perry and Ferrell both testified that they watched the entire transaction from across the street. They recorded the events, and, although they could not see the exact transaction because it occurred from inside the vehicle, they were able to see and record the Defendant pull up to the gas station and go into the store. They saw the Defendant come out of the store, drive to where Elrod was located, and they heard conversation dealing with the sale of narcotics. The detectives then met with Elrod, and she gave them the cocaine that she had received. Finally, Agent Gray testified that he analyzed the evidence in this case, and he concluded that it was cocaine. Accordingly, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. This issue is without merit.

**B. Motion to Withdraw**

Next, the Defendant claims that the trial court abused its discretion by refusing to allow his attorney to withdraw from his case, and he was prejudiced as a result of the trial court's refusal. The

State counters that the trial court properly denied the Defendant's motion to remove appointed counsel, and the Defendant was not prejudiced by this action.

Both the United States and Tennessee Constitutions guarantee an indigent criminal defendant the right to assistance of appointed counsel at trial. See U.S. Const. amend VI; Tenn. Const. art. I § 9. However, the Sixth Amendment's protection includes no guarantee of the right to a meaningful relationship between an accused and his counsel, whether counsel be appointed or retained. Morris v. Slappy, 461 U.S. 1, 14 (1983); State v. Carruthers, 35 S.W.3d 516, 546 (Tenn. 2000). Neither the federal nor state constitutions requires that an indigent defendant receive counsel of his choice, or counsel with whom the defendant enjoys "special rapport, confidence, or even a meaningful relationship." Carruthers, 35 S.W.3d at 546. The baseline guarantee is one of effectuve counsel, not preferred counsel. Id.

With respect to motions to withdraw, the trial court may, upon good cause shown, permit the withdrawal of an attorney appointed to represent an indigent defendant. Tenn. Code Ann. § 40-14-205(a). When a defendant seeks to substitute counsel, he or she has the burden of establishing to the trial judge's satisfaction that "(a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them." State v. Gilmore, 823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991). The trial court has wide discretion in matters regarding the appointment and relief of counsel, and its decision will not be set aside on appeal unless the defendant shows an abuse of discretion. State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). Further, the defendant must demonstrate that he was prejudiced by the trial court's denial of the motion to withdraw. See State v. Branam, 855 S.W.2d 563, 566 (Tenn. 1993).

The record reflects that, at the hearing on the motion, the Defendant alleged several reasons why appointed counsel should be allowed to withdraw from the representation of the Defendant. The trial court considered these reasons and asked the Defendant to specifically state what legal basis existed to remove defense counsel. The trial court explained to the Defendant the following:

> [T]his lawyer you have now, you didn't choose but just because you are not satisfied with her doesn't mean she is going to be removed. You are going to have to show me that she it not prepared to try your case. We're going to have a trial as quickly as we can unless you can show me how [Counsel] is not prepared to try your case. So far, the only thing you have told me is you don't like her. You may be justified in that, but that is not a basis for removing her as your attorney. I am going to have to be convinced that you can't get a fair trial with this - - with the public defender's office representing you before I will remove any lawyer from the case. That's the standard that I use.

The trial court then asked the Defendant the following:

THE COURT: . . . We have two questions. One, is the public defender's office prepared to go to trial, and two, if not, why not? Those are the only questions that I am interested in today. I'll hear you as long as you want to answer either of those two questions for me.

[DEFENDANT]: Well, if [defense counsel] says she is ready, I guess we're ready.

The court then heard from defense counsel, who stated the following:

I met with [the Defendant] on March 19th. We had a heated discussion. I felt that it ended perhaps well enough that I could proceed as representing him. I have been in practice now since 1992, so I feel I have experienced enough with the clients that I can determine whether or not the relationship had broken down. Obviously, [the Defendant] did not feel that way because he wrote this letter that is dated March 19th. On our meeting with him [the next week] he made no mention of a letter, which I was surprised when I got back to the office that the letter was there at that point. We decided not to file a motion to withdraw. We decided to wait. Mr. Conn, our investigator, spoke with [the Defendant] again quite at length yesterday afternoon. Due to the same allegations being made that I was working with the district attorney, that I was incompetent, essentially following along the line of thought he had written in this letter, we waited until this morning. We had set a deadline as to whether or not he would accept the offer or whether or not we needed to proceed. . . . [W]e decided to fo ahead and file a motion being that it seems we were going to trial, and at this point, we felt like it should be brought to the Court's attention the acrimonious relationship between the [D]efendant and myself. There have been times that we argued . . . . We have discussed strategy. We have discussed entrapment. . . . However, after being fairly vehemently attacked in the letter as far as him saying that I need to be disbarred, I don't know how well that trial relationship will go, Your Honor.

After hearing the Defendant, defense counsel, and comments by the State, the trial court made the following findings, acknowledging that it was a difficult decision:

Now the Court makes the following findings of fact based upon that which would have been the proof had this matter gone to a full evidentiary hearing. [The Defendant] raises two issues. One is that there is a conflict between the public defender's representation of him in this case that would disqualify them, and as I explained to [the Defendant] beforehand, a conflict is a term of art. It doesn't mean that there is a problem, which [the Defendant] says that there is, but that there is a situation that exists that would call into question the loyalties of the attorney representing the client. In this case, the one that is set for trial . . . the Court had

-8-

heard no evidence that there exists any conflict. . . . I have not heard any evidence otherwise, and consequently, the Court finds there to be no conflict of interest that would call into question [defense counsel]'s or the public defender's office loyalties to their client. There can, however, develop a conflict that, although the person's loyalty may not be called into question, their vigor with which they would proceed can be affected by the relationship between the defendant and appointed counsel, and that is the basis of [defense counsel's] motion. It is also, as [the Defendant] points out, a cause for concern with him and which is the basis of his pro se motion, as he says he has some question as to whether or not [defense counsel] is doing as good a job as he would hope that she would do. Now [the Defendant], unfortunately, is in the position that he does not get to select his attorney. He is indigent, and he has to take whichever attorney that the Court feels is best qualified to represent [the Defendant]. Now current Rule 13, as well as the statute creating the public defender's office, requires - - and it is not discretionary with the Court unless the Court finds some reason, but it requires that the public defender's office be appointed in indigent cases. It says "shall." It doesn't say "may," and unless the Court finds good cause, it has been the practice of this Judge to always appoint the public defender's office unless there is either (a) a conflict or (b) that there is a good reason so that the economy of the situation is such that other counsel should be appointed, so [the Defendant] doesn't have any choice. He gets the public defender's office. Now if the public defender's office is not performing as they should, then [the Defendant] has a right to be heard by the Court, but the question which the Court has before it is – and as I tried to state it at the beginning of this hearing so everyone would know how the Court is focused – (1) Is the public defender's office prepared to go to trial, and (2) if not, why?. . . The Court finds that [defense counsel] as well as other members of the public defender's office has investigated this case as well as can be investigated.

[Defense counsel] didn't ever indicate to the Court that she either would not or could not follow the instructions of her client. The balance which the Court must do in these situations is on the one hand, we have a man who has been in jail for almost two years. We have a case that has been on this Court's docket for almost two years, and for [the Defendant], on the other side of that coin is [the Defendant's] desire to have the attorney that he would feel more comfortable with. Well, the tail doesn't wag the dog, and if this Court were to allow [the Defendant] to select yet a third attorney because of either threats he has made or letters he has written, then the precedent would be set throughout all the courts of this land that all they would need to do if they weren't satisfied with the lawyer that was appointed to them is call them dirty names and write a dirty letter or threaten to turn them in to the Board, and the Judge is going to turn around and appoint somebody else. That would reek utter and total chaos with the court system. . . . this Court feels that this balance certainly goes to denying the pro se motion to appoint new counsel, denying the motion to withdraw as counsel. Given the fact this case has been so old, given the fact that the public

defender's office says they are ready, although not necessarily willing, to pursue the defense as the defendant has instructed, but they are capable and may pursue that defense, the [D]efendant's motion as well as the motion of the public defender's office are denied.

In this case, the Defendant clearly showed his mistrust of his trial counsel, however, he did not demonstrate that his counsel was failing to perform in the Defendant's best interest, had a conflict of interest, or was otherwise unable to discharge the task of representing the Defendant. The Defendant has offered no evidence that counsel did not advise him fairly or honestly or that counsel was not prepared to proceed with his trial. Although the tension between the Defendant and counsel was apparent, communication between the Defendant and counsel continued, and counsel stated that she was able and willing to proceed with his trial. We cannot conclude that the trial court abused its discretion by denying the Defendant's motion for appointed counsel to withdraw. Further, the Defendant has not presented any evidence that the court's refusal to change his attorney resulted in prejudice to him. Accordingly, we conclude that this issue is without merit.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the Defendant's conviction and sentence.

_____
ROBERT W. WEDEMEYER, JUDGE